UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

—————————————————— x

CRAIG PUERTA, Individually and on Behalf
of All Others Similarly Situated,

                       Plaintiff,

   vs.

TILE SHOP HOLDINGS, INC., ROBERT A.
RUCKER, THE TILE SHOP, INC.,
TIMOTHY C. CLAYTON, PETER J.
JACULLO III, JWTS, INC., PETER H.
KAMIN, TODD KRASNOW, ADAM L.
SUTTIN and WILLIAM E. WATTS,

                    Defendants.

—————————————————— x

Civil Action No. 13-CV-8331-JMF

CLASS ACTION

COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS

DEMAND FOR JURY TRIAL

Plaintiff Craig Puerta, individually and on behalf of all others similarly situated, by plaintiff's undersigned attorneys, for plaintiff's complaint against defendants, alleges the following based upon personal knowledge as to plaintiff and plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through plaintiff's attorneys, which included, among other things, a review of Tile Shop Holdings, Inc.'s ("Tile Shop" or the "Company") press releases, U.S. Securities and Exchange Commission ("SEC") filings, analyst reports, media reports, and other publicly disclosed reports and information about the defendants. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a securities class action on behalf of all purchasers of the common stock of Tile Shop between August 22, 2012 and November 13, 2013, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Act of 1934 (the "1934 Act"). Due to the defendants' false statements, Tile Shop was able to complete a December 12, 2012 secondary public stock offering (the "December 2012 SPO") and a June 5, 2013 secondary public stock offering (the "June 2013 SPO") (collectively, the "Offerings") at artificially inflated prices.

## JURISDICTION AND VENUE

2.      The claims asserted herein arise under §§10(b) and 20(a) of the 1934 Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 (17 C.F.R. §240.10b-5) promulgated thereunder by the SEC. Jurisdiction is conferred by §27 of the 1934 Act (15 U.S.C. §78aa).

3.      Venue is proper pursuant to §27 of the 1934 Act. Certain of the acts and conduct complained of herein, including the dissemination of materially false and misleading information to the investing public, occurred in this District.

4.    In connection with the acts and conduct alleged herein, defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications, and the facilities of the national securities exchanges and markets.

## PARTIES

5.    Plaintiff Craig Puerta purchased Tile Shop common stock as set forth in the certification attached hereto and incorporated herein by reference and was damaged thereby.

6.    Defendant Tile Shop is a publicly traded, specialty retailer of manufactured and natural stone tiles, setting and maintenance materials, and related accessories in the United States. As of October 1, 2013, it operated 80 stores in 25 states and also sells its products through its website, tileshop.com.   Tile Shop was founded in 1985 and is headquartered in Plymouth, Minnesota.  The Company's common stock has been listed and traded on the NASDAQ under the ticker symbol "TTS" since August 22, 2012.  As of November 1, 2013, the Company had more than 51 million shares of common stock issued and outstanding.

7.    Defendant Robert A. Rucker ("Rucker") is and was, at the time of the Offerings and throughout the Class Period, Chief Executive Officer ("CEO") and a director of Tile Shop.  Rucker signed the false and misleading registration statements used to conduct the Offerings.  Rucker, along with The Tile Shop, Inc., his wholly owned company, sold 1,029,407 shares in the December 2012 SPO, receiving more than $15.44 million in gross proceeds, and sold 1,000,000 shares in the June 2013 SPO, receiving $24.25 million in gross proceeds.

8.    Defendant The Tile Shop, Inc. ("TS, Inc.") is a Minnesota corporation wholly owned and operated by Rucker.  According to the registration statements used to conduct the Offerings, "Rucker is the sole director of TS, Inc. and may be deemed to have sole voting and investment power over the securities held by TS, Inc."  TS, Inc. sold 1,029,407 shares in the December 2012

- 2 -

SPO, receiving more than $15.44 million in gross proceeds, and sold 1,000,000 shares in the June 2013 SPO, receiving $24.25 million in gross proceeds.

9.      Defendant Timothy C. Clayton ("Clayton") is and was, at the time of the Offerings and throughout the Class Period, Chief Financial Officer ("CFO") of Tile Shop.  Clayton signed the false and misleading registration statements used to conduct the Offerings.

10.     Defendant Peter J. Jacullo III ("Jacullo") is and was, at the time of the Offerings and throughout the Class Period, a director of Tile Shop.  Jacullo signed the false and misleading registration statements used to conduct the Offerings.  Jacullo, and his wholly owned company, defendant JWTS, Inc., collectively sold 713,274 shares in the December 2012 SPO, receiving nearly $10.7 million in gross proceeds, and sold 600,000 shares in the June 2013 SPO, receiving $14.55 million in gross proceeds.

11.     Defendant JWTS, Inc. ("JWTS") is a Delaware corporation wholly owned by defendant Jacullo.  According to the registration statements used to conduct the Offerings, "Jacullo is the sole director of JWTS and may be deemed to have sole voting and investment power over the securities held by JWTS."  JWTS sold 713,274 shares in the December 2012 SPO, receiving nearly $10.7 million in gross proceeds, and sold 600,000 shares in the June 2013 SPO, receiving $14.55 million in gross proceeds.

12.     Defendant Peter H. Kamin ("Kamin") is and was, at the time of the Offerings and throughout the Class Period, a director of Tile Shop.  Kamin signed the false and misleading registration statements used to conduct the Offerings.  Kamin sold 100,000 shares in the June 2013 SPO, receiving $2.425 million in gross proceeds.

13.     Defendant Todd Krasnow ("Krasnow") is and was, at the time of the Offerings and throughout the Class Period, a director of Tile Shop.  Krasnow signed the false and misleading

registration statements used to conduct the Offerings.  Krasnow sold 15,000 shares in the June 2013 SPO, receiving $363,750 in gross proceeds.

14.     Defendant Adam L. Suttin ("Suttin") is and was, at the time of the Offerings and throughout the Class Period, a director of Tile Shop.  Suttin signed the false and misleading registration statements used to conduct the Offerings.  Suttin sold 45,560 shares in the December 2012 SPO, receiving $68,340 in gross proceeds.

15.     Defendant William E. Watts ("Watts") is and was, at the time of the Offerings and throughout the Class Period, a director of Tile Shop and the Chairman of its Board of Directors.  Watts signed the false and misleading registration statements used to conduct the Offerings.  Watts sold 34,696 shares in the December 2012 SPO, receiving $520,440 in gross proceeds.

16.     The defendants referenced above in ¶¶7, 9-10 and 12-15 are collectively referred to herein as the "Individual Defendants."

## BACKGROUND

17.     The Tile Shop LLC was founded by defendant Rucker in 1985.  The company sells thousands of types of tile and stone flooring in its nationwide retail stores.  The majority of its product is produced overseas, with the majority of that sourced from Asia.

18.     The Tile Shop LLC has sought to distinguish itself from big-box home improvement competitors like Home Depot and Lowe's (and their predecessors) by sourcing from around the world, claiming that permitted the company to offer a greater variety and quality of product with better customer service than its big-box rivals.  Between 2007 and 2011, The Tile Shop LLC reports having achieved net sales and earnings before interest, taxes, depreciation and amortization, less one-time accounting items ("Adjusted EBITDA") increases at compounded annual growth rates of 8.2% and 13.3%, respectively, driven – according to the company – by its exponential rollout of new retail locations and increases in same store sales.

19.     The company was taken public in 2010 through the acquisition of a special purpose acquisition company, or SPAC, backdooring its way into the public stock market without undergoing the level of SEC vetting that typically accompanies an initial public stock offering.

20.     Specifically, the common stock of JWC Acquisition Corp. ("JWC"), a blank check company incorporated in the State of Delaware in July 2010, was listed on the OTC under the ticker symbol "JWCAU."  JWC was founded, owned and controlled by defendants Suttin and Watts (its president and vice president, respectively, and the co-founder and operating partner of private equity firm J.W. Childs, LLC ("J.W. Childs")).

21.     In June 2012, The Tile Shop LLC (then controlled by Rucker) incorporated in the State of Delaware and through a series of transactions acquired JWC.  Tile Shop's stock was listed and began trading on the NASDAQ on August 22, 2012 under the ticker symbol TTS, replacing the JWCAU listing.  As part of that series of transactions, the other owners of The Tile Shop LLC (identified below) contributed all of the membership interests in The Tile Shop LLC in exchange for an aggregate of approximately $75 million in cash, $70 million in promissory notes (the "Promissory Notes"), and 32 million shares of Tile Shop common stock, receiving as follows:

| | Cash Consideration | Promissory Notes | Shares of Tile Shop Common Stock |
|---|---|---|---|
| Nabron International, Inc. ("Nabron"), a Bahmas company[1] | $ 37,732,065 | $ 37,479,696 | 17,445,432 |
| Defendant TS, Inc. (entity controlled by defendant Rucker) | $ 23,792,481 | $ 18,887,729 | 8,313,792 |
| Defendant JWTS, Inc. (entity controlled by defendant Jacullo) | $ 11,843,840 | $ 11,764,632 | 5,476,003 |
| Peter H. Kamin Revocable Trust dated February 2003 (entity controlled by defendant Kamin) | $ 584,101 | $ 580,194 | 270,059 |
| Peter H. Kamin Childrens Trust dated March 2007 (entity controlled by defendant Kamin) | $ 350,460 | $ 348,116 | 162,035 |
| 3K Limited Partnership (entity controlled by defendant Kamin) | $ 233,639 | $ 232,077 | 108,023 |
| Peter H. Kamin GST Trust (entity controlled by defendant Kamin) | $ 65,239 | $ 73,984 | 35,361 |
| Defendant Krasnow | $ 298,878 | $ 306,060 | 143,384 |

22.     As part of the JWC acquisition, each share of JWC was also converted into a share of Tile Shop and those shares were distributed as follows: 208,734 shares to defendant Suttin, 39,284 shares to a trust affiliated with defendant Suttin, and 151,123 shares to defendant Watts.

23.     In August 2012, Tile Shop also issued and sold 1.5 million shares of its common stock to 9 accredited investors at a purchase price of $10 per share, generating total gross proceeds of $15 million, including 1,080,000 shares of common stock issued to J.W. Childs, making it a 5% stockholder of the Company, 110,000 shares of common stock issued to defendant Suttin, and 100,000 shares of common stock issued to defendant Watts.

24.     On October 3, 2012, Tile Shop paid the entire outstanding principal balance of the Promissory Notes, together with all accrued interest thereon, in an aggregate amount of $70+ million in full satisfaction of its obligations pursuant to the Promissory Notes.

---

[1]     Nabron was an early investor, having invested in 2002, and provided funding to complete the JWC acquisition.

25.     In connection with the JWC acquisition, the Company entered into a registration rights agreement under which the holders of a majority in interest of Tile Shop common stock were entitled to require the Company, *on up to four occasions*, to register under the Securities Act of 1933 the shares of Tile Shop common stock that they received, *at any time after August 21, 2013*. The December 2012 SPO and the June 2013 SPO would be undertaken to allow the Individual Defendants, defendants TS, Inc. and JWTS, Inc., and non-party J.W. Childs, to cash out.

## FALSE AND MISLEADING CLASS PERIOD STATEMENTS

26.     The Class Period starts on August 22, 2012.  On the prior evening, August 21, 2012, Tile Shop issued a press release entitled "Tile Shop Holdings, Inc. and JWC Acquisition Corp. Announce Closing of Business Combination, *Trading of Common Stock on Nasdaq to Commence on Wednesday, August 22, 2012*."  The press release quoted defendants Rucker and Watts stating in pertinent part as follows:

> Robert Rucker, Founder and CEO of The Tile Shop and TS Holdings, commented, "We are extremely excited about our transition into a publicly-traded company and view this as an important milestone in the evolution of our company and the expansion of our brand.  *As we have said before, we intend to not only continue our self-funded store growth across the country but will also be better positioned to take advantage of the anticipated increased demand for our products as a result of our additional resources*.  The business combination with JWCAC will strengthen our ability to pursue attractive growth opportunities in new and existing markets, as we work towards building a national presence."

> William Watts, a former officer of JWCAC who will be Chairman of TS Holdings commented, "We are pleased to complete this merger with The Tile Shop, a truly unique retailer and leader in the industry.  *The Tile Shop has the ability to grow dramatically with strong sustained margins and we expect to build this company into the formidable leading provider of stone tiles, setting and maintenance materials, and related accessories*."

27.     On October 3, 2012, Tile Shop entered into a Credit Agreement, dated as of October 3, 2012, with Bank of America, N.A. (the "Credit Agreement").  The Credit Agreement provided Tile Shop with a $100 million senior secured credit facility, comprised of a five-year $25 million

term loan and a $75 million revolving line of credit.  Borrowings pursuant to the Credit Agreement would bear interest at either a base rate or a LIBOR-based rate, at the option of the Company.

28.     On November 1, 2013, the Company issued a press release entitled "The Tile Shop Reports Third Quarter 2012 Results – Net Sales Increased 19.4% – 5.9% Comparable-Store Sales Growth – Company On Target To Open 13 Stores By Year End."  In addition to emphasizing that the Company's "[n]et sales increased 19.4% to $44.3 million for the quarter ended September 30, 2012 compared with $37.1 million for the comparable quarter last year," that the "increase in sales was partially driven by an increase in comparable-store sales growth of 5.9%, adding $2.2 million in net sales, and incremental net sales of $5.0 million from the opening of new stores," and that "[f]or the quarter, Adjusted EBITDA was $11.2 million, compared to $9.3 million in the same period of the prior year, an increase of $1.9 million, or 19.9%," the release quoted defendant Rucker stating in pertinent part as follows:

> "Our financial results for the third quarter, our first as a public company, were driven by strong sales growth including a 5.9% same store sales increase along with the opening of one new store during the third quarter, putting the Company on target to reach its goal of 66 stores by the end of the year.  We intend to fund our anticipated growth with internally generated cash flow.  ***Our model of direct sourcing, exceptional customer service, strategically located stores and a proven distribution center model allows us to operate at high margins within this growing industry***."

29.     Later on the evening of November 1, 2012, defendants Watts, Rucker and Clayton conducted a conference call with investors during which further positive statements were issued about the Company's then-present business metrics and financial prospects.  In particular, defendant Watts provided the following updated fiscal 2012 and 2013 financial guidance:

> Based on our third quarter results and current projections for the fourth quarter, I want to update you on our projections relative to the four metrics where we provided guidance on our recent road show.

> Let me start with revenue.  The projection in the road show was $180 million in sales for 2012 and ***$222 million in 2013***.  ***Our current forecast supports a minimum of those assumptions***.  In terms of comps, the projection in the road show

was 5.4% in 2012 and 6.1% in 2013. ***Based on actual comps in Q3 and current projections for Q4, we now expect to slightly exceed the comp projections for 2012 and remain comfortable with the original projection of 6.1% comps for 2013***.

                            *       \*       \*

       Let me talk about adjusted EBITDA.  The projected EBITDA for 2012 was $51 million and ***$60 million in 2013***.  We now expect EBITDA for 2012 of between $50 million to $51 million. . . . .  ***We do remain comfortable with the $60 million EBITDA projection for 2013***.

30.     On November 9, 2012, Tile Shop filed its quarterly financial report on Form 10-Q with the SEC which was signed and certified as to veracity pursuant to the Sarbanes-Oxley Act of 2002 ("Sarbanes-Oxley") by defendants Rucker and Clayton.  As to "Gross profit," the Form 10-Q stated in pertinent part that "[i]n 2011, 2010, and 2009 our gross margin was 73.6%, 73.3%, and 72.7%, respectively," that "[f]or the nine months ended September 30, 2012 and 2011 our gross margin was 72.9% and 73.7%, respectively," and significantly that: "***[w]e have been able to maintain stable gross margins as a result of product cost control and expect that our gross margin will continue in the same range***."

31.     On or about November 28, 2012, Tile Shop filed with the SEC a Form S-1 Registration Statement (File No. 333-185180), which was amended on December 10, 2012 and declared effective by the SEC on December 12, 2012.

32.     On December 13, 2012, Tile Shop priced the December 2012 SPO and filed its final prospectus, which formed part of the registration statement, pursuant to which certain selling stockholders, including several Tile Shop senior executives and directors, sold 5.175 million shares of common stock to the public at $15.00 per share (collectively with the registration statement originally filed November 28, 2012, the "December 2012 Registration Statement").[2] ***Tile Shop did not sell any shares in the December 2012 SPO***.  The "Selling Stockholders" in the December 2012

---

[2]    Nabron also sold 2,272,304 shares, and additional shares were sold by others.

SPO included: (i) defendant Rucker, and his wholly owned company, defendant TS, Inc., who collectively sold 1,029,407 shares, receiving more than $15.44 million in gross proceeds; (ii) defendant Jacullo, and his wholly owned company, defendant JWTS, Inc., who collectively sold 713,274 shares, receiving nearly $10.7 million in gross proceeds; (iii) defendant Suttin who sold 45,560 shares, receiving $68,340 in gross proceeds; and (iv) defendant Watts who sold 34,696 shares, receiving $520,440 in gross proceeds.

33.    On January 17, 2013, Tile Shop filed the following slide with the SEC as part of an "Investor Presentation" being used by Tile Shop to communicate with investors:



34.    On February 20, 2013, Tile Shop issued a press release entitled "The Tile Shop Reports Fourth Quarter 2012 Results – 9.8% Comparable Store Sales Growth in Fourth Quarter / 7.1% Increase for 2012 – Adjusted EBITDA of $12.0 Million in Fourth Quarter / $50.6 Million for 2012 – Six Stores Opened in Fourth Quarter / 15 Stores Opened in 2012."   In addition to

emphasizing that for the fourth quarter "[n]et sales increased 22.5% to $46.2 million for the quarter ended December 31, 2012 versus $37.7 million for the comparable quarter last year," that "growth in sales was driven by an increase in comparable-store sales of 9.8%, adding $3.7 million in net sales, and incremental net sales of $4.8 million from the opening of new stores during the year," that "[f]or the quarter, Adjusted EBITDA was $12.0 million compared to $9.9 million in the same period of the prior year, an increase 21.2%," and that "[f]or the year ended December 31, 2012, net sales increased by $29.9 million or 19.6% to $182.7 million for the full year 2012 from $152.7 million in 2011," "[c]omparable-store sales growth for 2012 was 7.1% as compared to a 6.4% increase in 2011," and that "Ajusted EBITDA increased 18.9%, or $8.0 million, to $50.6 million for the full year 2012," the release quoted defendant Rucker stating in pertinent part as follows:

> "The fourth quarter of 2012 was another strong quarter for the Company from both a financial and operational perspective. . . .  Fourth quarter sales were strong, as evidenced by the 9.8% increase in same store sales and we opened six new stores in the quarter, bringing the total number of new stores opened in the year to 15.  We ended 2012 with 68 stores in 22 states, a 28% year-over-year unit growth.  In addition, at the end of the quarter, we completed the purchase of our fourth distribution center, which will enable us to open stores in the attractive Texas and Colorado markets in 2013. ***Our unique operating model, which combines direct sourcing, exciting in-store displays, exceptional customer service and strategically located stores, has enabled the Company to grow while maintaining our strong financial performance***.  As we move into 2013 we will continue to expand our presence throughout the country, while staying focused on providing our customers with unique products and great service."

35.     Later on the evening of February 20, 2013, defendants Watts, Rucker and Clayton conducted a conference call with investors during which further positive statements were issued about the Company's then-present business metrics and financial prospects.  Specifically, during his opening remarks defendant Watts emphatically stated that ***Tile Shop's "operating model produces extraordinary margins***; in fact, they're elite in hard good retailing," and that "***the strong revenue trends we saw in the fourth quarter are continuing early in the current year***."  Defendant Rucker opened his remarks "reiterating that [Tile Shop's] direct sourcing model ***remain[ed] a material***

*competitive advantage over the other players in the tile industry*," stating that "[w]hile all of our competitors have product, we uniquely provide a tile solution for our customers and *do it through our vertically integrated proprietary sourcing*," noting that "[s]ince the last earning call, [he had] traveled to Turkey, Spain, Vietnam and Indonesia and [would] be returning to China, Indonesia and Vietnam, shortly." During his opening remarks, defendant Clayton provided the following updated financial guidance:

> *We ... continue to be comfortable with the 2013 initial expectations that were provided at the time of the company's merger*. These include a new store growth rate of 25%, which now translates into 17 new stores for 2013.
>
> In terms of comp-store sales, we remain comfortable about being able to reach a 6.1% comp for the year, especially given that 11 stores will come into the comp base during 2013. This level of same-store sales plus the three incremental stores that were opened in 2012, coupled with the expected revenue from 17 new stores in 2013 provided the comfort that *the expectation of $222 million of revenues for 2013 will be exceeded*. We also continue to be comfortable with the *expectation of $60 million of adjusted EBITDA for the year*.

36.    On March 18, 2013, Tile Shop filed its annual financial report on Form 10-K with the SEC which was signed by all of the Individual Defendants and certified as to veracity pursuant to Sarbanes-Oxley by defendants Rucker and Clayton. As to "Gross Profit," the Form 10-K stated in pertinent part that "[i]n 2012, 2011, and 2010 our gross margin was 72.8%, 73.6%, and 73.3%, respectively," and significantly, that "*[w]e have been able to maintain relatively stable gross margins as a result of product cost control and retail price adjustments, in the past*. However, increases in freight and distribution costs, along with increased promotional activity may adversely impact our gross margins by 100 to 200 basis points over the next several years."

37.    On April 15, 2013, Tile Shop reported that its outside auditor, Deloitte & Touche LLP ("Deloitte") had been terminated effective April 9, 2013, and replaced by Ernst & Young LLP ("E&Y") as its independent registered public accounting firm effective immediately. According to the Company's Current Report on Form 8-K filed with the SEC that day:

On Form 10-K for the fiscal year ended December 31, 2011, the Company reported the existence of a material weakness in its internal control over financial reporting relating to deficiencies in the financial statement close process. Specifically, the Company lacked sufficient personnel with requisite competencies within its finance function for a company of its size and complexity and did not maintain financial close processes, procedures, and reporting systems that were adequately designed to support the accurate and timely reporting of its financial results. The Company reported the remediation of this material weakness in Item 9A of its Annual Report on Form 10-K for the fiscal year ended December 31, 2012.

On a Form 8-K dated February 18, 2013, the Company reported that its previously-issued financial statements for the three and nine months ended September 30, 2012 contained a misstatement relating to its accounting for outstanding common stock purchase warrants, and on a Form 10-Q/A filed March 18, 2013 restated such financial statements. *As a result of the restatement, on Form 10-K for the fiscal year ended December 31, 2012 the Company reported the existence of a material weakness in its internal control over financial reporting relating to its identification and analysis of the complex accounting and financial reporting attributes associated with certain non-routine transactions such as the Company's common stock purchase warrant agreements, including not utilizing qualified external experts to supplement internal resources*. The Company plans to implement additional procedures to remediate this material weakness.

38.     On May 1, 2013, Tile Shop issued a press release entitled "The Tile Shop Reports First Quarter 2013 Results – 10.4% Comparable Store Sales Growth – Adjusted EBITDA Increases 17.9% to $16.4 Million – Three New Stores Opened."   In addition to emphasizing that the Company's net sales increased 23.9% to $56.8 million for the 2013 first quarter (ended March 31, 2013), compared with $45.9 million for the 2012 first quarter; that the $11.0 million increase in sales was driven by an increase in comparable store sales of 10.4% or $4.8 million, and incremental net sales of $6.2 million from stores not included in the comparable stores base; that Adjusted EBITDA grew 17.9% to $16.4 million, compared to $13.9 million in the 2012 first quarter; and that Adjusted EBITDA as a percentage of sales was 28.8%, the release stated in pertinent part as follows:

"*Steady growth and strong financial performance continues* at The Tile Shop as evidenced by our results for the first quarter 2013," stated Robert Rucker, Chief Executive Officer.  "Our results for the quarter were driven by a 10.4% increase in same store sales, an impressive improvement over the strong 9.9% same store sales growth in the first quarter of last year and the 9.8% increase achieved in the fourth quarter of 2012.  This level of sales growth *clearly demonstrate that our*

- 13 -

*store layout and broad product assortment is providing a much needed solution to the needs of our customers*.  This unique 'in-store experience' is made possible by our operating model, which *enables us to source distinctive products directly from quarries throughout the world*.  Our customer-focused store presentation, together with our direct sourcing capabilities, *allows us to operate at high margins and drive value for all our stakeholders*."

*        *        *

"*We continue to be pleased with the performance of the new stores that have opened in the past year*," stated Mr. Rucker.  Our stores *continue to produce consistent financial performance starting in the first year of operation*, whether it is in a new market or in an existing market."

39.    Later on the evening of May 1, 2013, defendants Watts, Rucker and Clayton conducted a conference call with investors during which further positive statements were issued about the Company's then-present business metrics and prospects.  Updating and increasing fiscal 2013 financial guidance previously provided in February 2013, defendant Clayton stated in pertinent part as follows:

As we look forward, we continue to be comfortable with the 2013 initial expectations that were discussed during the February conference call.  These expectations included a new store growth rate of 25% which translates into *17 new stores for 2013*.  We are very comfortable with opening *17 new stores* this year.

In terms of comp store sales, *we now believe that we should be able to exceed the 6.1% comp store sales guidance previously provided.  In view of the Q1 results and the expectation of 17 new stores in 2013, we are also comfortable that we will exceed the revenue expectation of $222 million previously provided*.

*We also continue to be comfortable with the expectation of $60 million of adjusted EBITDA for the year*.

40.    On May 10, 2013, Tile Shop filed its quarterly financial report on Form 10-Q with the SEC which was signed and certified as to veracity pursuant to Sarbanes-Oxley by defendants Rucker and Clayton.  As to "Gross profit," the Form 10-Q stated in pertinent part that "[f]or the three months ended March 31, 2013 and 2012 our gross margin was 71.0% and 73.5%, respectively," that "[g]ross profit increased $6.7 million, or 19.8%, for the three months ended March 31, 2013

compared to the three months ended March 31, 2012, *primarily due to the increase in net sales*," that "[g]ross margin decreased from 73.5% for the three months ended March 31, 2012 to 71.0% for the three months ended March 31, 2013," and that this "change was primarily driven by slightly higher product related costs, transportation expenses and increase promotional discounts."

41.     On or about May 24, 2013, Tile Shop filed with the SEC a Form S-1 Registration Statement (File No. 333-188861), which was amended on June 3, 2013 and declared effective by the SEC on June 4, 2013.

42.     On June 5, 2013, Tile Shop priced the June 2013 SPO and filed its final prospectus, which formed part of the registration statement, pursuant to which certain selling stockholders, including several Tile Shop senior executives and directors, sold 4,887,500 shares of common stock to the public at $24.25 per share on June 5, 2013 (collectively with the registration statement originally filed May 24, 2013, the "May 2013 Registration Statement").[3] *Once again, Tile Shop sold no shares in the June 2013 SPO.* These "Selling Stockholders" in the June 2013 SPO included: (i) defendant Rucker, and his wholly owned company, defendant TS, Inc., who collectively sold 1,000,000 shares, receiving $24.25 million in gross proceeds; (ii) defendant Jacullo, and his wholly owned company, defendant JWTS, Inc., who collectively sold 600,000 shares, receiving $14.55 million in gross proceeds; (iii) defendant Kamin who sold 100,000 shares, receiving $2.425 million in gross proceeds; and (iv) defendant Krasnow who sold 15,000 shares, receiving $363,750 in gross proceeds.

43.     On July 30, 2013, the Tile Shop issued a press release entitled "The Tile Shop Reports Second Quarter 2013 Results – 14.3% Comparable Store Sales Growth – Adjusted EBITDA Increases 16.6% to $15.8 Million – Company Now Expects to Open 20 New Stores in 2013." In

---

[3]     Nabron again sold 2,100,156 shares, and additional shares were sold by others.

addition to reporting that net sales increased 25.5% to $58.1 million for the second quarter 2013

(ended June 30, 2013), compared with $46.3 million for the second quarter 2012; that the $11.8

million increase in sales was driven by an increase in comparable store sales of 14.3% or $6.6

million, and incremental net sales of $5.2 million from stores not included in the comparable stores

base; and that for the quarter, Adjusted EBITDA grew 16.6% to $15.8 million, compared to $13.6

million in the same period of second quarter 2013; and Adjusted EBITDA as a percentage of sales

was 27.2%, the press release stated in pertinent part as follows:

> Robert Rucker, Chief Executive Officer, stated, "***Strong performance at both the Company's new stores and at its legacy stores contributed to another strong quarter***.  The 14.3% increase in same store sales, represents both meaningful sequential, as well as year-over year growth."

> "***The Tile Shop is proving that its model has a strong affinity with the consumer across all of our markets, as demonstrated by our increasing market share***," Mr. Rucker continued.  The combination of our broad product assortment, room-sized displays, knowledgeable sales associates and competitive pricing, provide a very satisfying in-store experience for our customers.  Because of the success of our retail model, our investments in additional infrastructure to support our growth, and the recent opening of our new distribution center in southern Oklahoma, we are in position to increase our expected new store openings in 2013 from 17 to 20.  While this may result in some short term margin pressures, it is an important investment that will provide for increased long-term growth and build additional value for all our stakeholders."

44.     Later on the evening of July 30, 2013, defendants Watts, Rucker and Clayton

conducted a conference call with investors during which further positive statements were issued

about the Company's then-present business metrics and prospects.  Updating and increasing fiscal

2013 financial guidance previously provided in February 2013 and updated in May 2013, defendant

Watts stated in pertinent part that the ***Tile Shop was "reiterating . . . earlier guidance of $60 million***

***of EBIDTA***."

45.     On August 8, 2013, Tile Shop filed its quarterly financial report on Form 10-Q with

the SEC which was signed and certified as to veracity pursuant to Sarbanes-Oxley by defendants

Rucker and Clayton.  As to "Gross profit," the Form 10-Q stated in pertinent part that between December 31, 2008 and December 31, 2012, "we opened 26 new retail locations and *focused on cost control and implementing selected price increases in order to maintain our gross profit and income from operations*," and that:

> *Gross profit increased $7.2 million, or 21.4%, for the three months ended June 30, 2013 compared to the three months ended June 30, 2012, primarily due to the increase in net sales*.  For the three months ended June 30, 2013 and 2012 our gross margin was 70.3% and 72.7%, respectively.  The decrease in margin can be attributed to slight increases in product acquisition, freight and distribution costs.  In addition, we have used selective product related promotions and shipping discounts to generate or secure sales.  All of these actions are specifically designed to drive traffic and enhance customer satisfaction.  *In view of our overall strong gross margins, we believe that an aggressive approach to capturing market share, while impacting gross margins slightly in the short term, serves to enhance our long term prospects*.

46.    On these statements, Tile Shop stock traded at artificially inflated prices throughout the Class Period, reaching a Class Period high of $30.88 in intraday trading on July 11, 2013 and permitting the Individual Defendants to cash in by selling tens of millions of dollars of Tile Shop stock at artificially inflated prices.  Tile Shop was able to procure the valuable Bank of America credit facility and line of credit.

47.    Defendants' statements referenced above were each materially false and misleading when made because they misrepresented and failed to disclose the following adverse facts, which were known to defendants, or recklessly disregarded by them:

(a)    Tile Shop had been acquiring the vast majority of its product from China, paying below-market prices for product that contained dangerously high lead levels;

(b)    as a result of its sourcing product from China with dangerously high lead levels, the Company was reporting unsustainably high profit margins and faced customer backlash and millions of dollars in potential legal liability;

- 17 -

(c)     Tile Shop had acquired 8.3% of its product sold in fiscal 2011, 16.3% of its product sold in fiscal 2012, and 32.2% of its product sold in fiscal 2013 from a Chinese supplier called Beijing Pingxiu ("BP") that was owned and operated by defendant Rucker's brother-in-law, Fumitake Nishi, who was also himself an employee of Tile Shop, and as such, compliance with Item 404 of SEC Regulation S-K required that the purchases from BP be identified as related party transactions – but they were not;

(d)     Tile Shop had been using BP and other captive, phantom suppliers to overstate inventories, understate cost of sales and overstate gross profits in its Class Period financial reports; and

(e)     that as a result of the foregoing, defendants had overstated the Company's financial results throughout the Class Period by failing to disclose that the Company had been paying below-market prices to its suppliers, the reasons why, or that its ability to pay below-market prices for supplies was unsustainable.

48.     The December 2012 and June 2013 Registration Statements, including the materials incorporated therein by reference, and the final prospectuses (collectively, the "Registration Statements"), contained untrue statements of material facts or omitted to state other facts necessary to make the statements made not misleading.

49.     Describing the Company's product quality, both Registration Statements stated "***our long-term producer relationships***, together with our design, manufacturing and distribution capabilities, ***enable us to offer a broad assortment of high-quality products to our customers***, who are primarily homeowners, at competitive prices."

50.     As to "Competitive Strengths," both Registration Statements stated in pertinent part as follows:

*Proprietary Branding*

> We sell the majority of our products under our proprietary brand names, *which helps us to differentiate our products from those of our competitors*. We offer products across a range of price points and quality levels *that allow us to target discrete market segments and to appeal to diverse groups of customers*.

51.    Concerning the Company's "Growth Strategy," the December 2012 Registration Statement sated in pertinent part that:

> In the five years ended December 31, 2011, *we grew through a combination of opening 20 new retail locations and increases in same store sales. We expect to continue to gain market share*.

*    *    *

> *Increase Sales and Profitability of Existing Stores*

> We believe that our ongoing investment in new products and our enhanced training program for our sales associates, together with our associate incentive compensation structure, *will result in continued same store sales growth*.

The June 2013 Registration Statement stated in pertinent part that:

> In the five years ended December 31, 2012, *we grew through a combination of opening 29 new retail locations and increases in same store sales. We expect to continue to gain market share*.

*    *    *

> *Increase Sales and Profitability of Existing Stores*

> We believe that our ongoing investment in new products and our enhanced training program for our sales associates, together with our associate incentive compensation structure, *will result in continued same store sales growth*.

52.    Concerning the Company's "Sales Model," both Registration Statements stated in pertinent part as follows:

> *We appeal to customers who desire high-quality products* at an attractive value. . . .    Our sales strategy emphasizes customer service *by providing comprehensive and convenient education tools on our website and in our stores for our customers to learn about our products* and the tile installation process. *Our website contains a broad range of information regarding our tile products* . . . .

- 19 -

53.     Concerning "Marketing," both Registration Statements stated, in pertinent part, that

*"[w]e establish and maintain our credibility primarily through the strength of our products*."

54.     Concerning the Company's "Producers," the December 2012 Registration Statement

stated in pertinent part as follows:

> We currently purchases [sic] tile products from approximately 120 different
> producers.  Our top 10 tile suppliers accounted for approximately 55% of our tile
> purchases in 2011.  *We believe that alternative and competitive suppliers are*
> *available for most of our products*.  In 2011, approximately 53% of our purchased
> product was sourced from Asia, 9% from North America, 8% from South America,
> 29% from Europe, and 1% from other locations.  Over 95% of our foreign purchases
> are negotiated and paid for in U.S. dollars.

The June 2013 Registration Statement stated in pertinent part as follows:

> We currently purchase tile products from approximately 120 different
> producers.  Our top 10 tile suppliers accounted for approximately 52% of our tile
> purchases in 2012.  *We believe that alternative and competitive suppliers are*
> *available for most of our products*.  In 2012, approximately 58% of our purchased
> product was sourced from Asia, 9% from North America, 4% from South America,
> 29% from Europe, and less than 1% from other locations.  Over 95% of our foreign
> purchases are negotiated and paid for in U.S. dollars.

55.     Concerning "Government Regulation," both Registration Statements stated in

pertinent part as follows:

> We do not incur significant costs complying with environmental laws and
> regulations.  However, we *could be* subject to material costs, liabilities, or claims
> relating to environmental compliance in the future, *especially in the event of*
> *changes in existing laws and regulations or in their interpretation*.
>
> Products that we import into the United States are subject to laws and
> regulations imposed in conjunction with such importation, including those issued
> and/or enforced by U.S. Customs and Border Protection.  *We work closely with our*
> *suppliers to ensure compliance with the applicable laws and regulations in these*
> *areas*.

56.     Concerning the Company's net sales, gross profits, net income and earnings per share

over the preceding five-year period, the December 2012 Registration Statement stated in pertinent

part as follows:

| | As of September 30, or for the nine months ended September 30, | | As of December 31, or for the year ended December 31, | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | **2012** | **2011** | **2011** | **2010** | **2009** | **2008** | **2007** |
| **Statement of Income Data** | | | | | | | |
| *Net sales* | $ 136,463 | $ 115,015 | $ 152,717 | $ 135,340 | $ 116,247 | $ 118,960 | $ 111,607 |
| Cost of sales | 37,025 | 30,298 | 40,321 | 36,124 | 31,706 | 34,001 | 33,588 |
| *Gross profit* | 99,438 | 84,717 | 112,396 | 99,216 | 84,541 | 84,959 | 78,019 |
| Selling, general and administrative expenses | 68,606 | 58,225 | 78,368 | 68,105 | 60,051 | 61,322 | 58,539 |
| Deferred compensation expense | 3,897 | 966 | 1,415 | 450 | 120 | 260 | 150 |
| Income from operations | 26,935 | 25,526 | 32,613 | 30,661 | 24,370 | 23,377 | 19,330 |
| Interest expense | 626 | 297 | 443 | 467 | 545 | 592 | 972 |
| Other expense (income) | (23) | (36) | 77 | (124) | (73) | (675) | (563) |
| Income before income taxes | 26,332 | 25,265 | 32,093 | 30,318 | 23,898 | 23,460 | 18,921 |
| Benefit (provision) for income taxes[1] | 4,299 | (578) | (733) | (609) | (675) | (724) | (461) |
| *Net income* | $ 30,631 | $ 24,687 | $ 31,360 | $ 29,709 | $ 23,223 | $ 22,736 | $ 18,460 |
| *Earnings per share[1]* | $ 0.91 | $ 0.77 | $ 0.97 | $ 0.92 | $ 0.72 | $ 0.70 | $ 0.57 |
| Weighted average share outstanding | 33,544 | 32,000 | 32,261 | 32,330 | 32,330 | 32,330 | 32,330 |

The June 2013 Registration Statement stated in pertinent part as follows:

| | As of March 31, or for the three months ended March 31, | | As of December 31, or for the year ended December 31, | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | **2013** | **2012** | **2012** | **2011** | **2010** | **2009** | **2008** |
| | | | (In thousands, except share data) | | | | |
| **Statement of Income Data** | | | | | | | |
| *Net sales* | $ 56,835 | $45,861 | $182,650 | $152,717 | $135,340 | $116,247 | $118,960 |
| Cost of sales | 16,462 | 12,173 | 49,626 | 40,321 | 36,124 | 31,706 | 34,001 |
| *Gross profit* | 40,373 | 33,688 | 133,024 | 112,396 | 99,216 | 84,541 | 84,959 |
| Selling, general and administrative expenses | 28,354 | 22,064 | 94,716 | 78,368 | 68,105 | 60,051 | 61,322 |
| Deferred compensation expense | — | 1,160 | 3,897 | 1,415 | 450 | 120 | 260 |
| Income from operations | 12,019 | 10,464 | 34,411 | 32,613 | 30,661 | 24,370 | 23,377 |
| Interest expense | 594 | 90 | 1,252 | 443 | 467 | 545 | 592 |
| Change in fair value of warrants | 51,845 | — | 82,063 | — | — | — | — |
| Other income (expense) | (33) | 7 | 15 | (77) | 124 | 73 | 675 |
| (Loss) income before income taxes | (40,453) | 10,381 | (48,889) | 32,093 | 30,318 | 23,898 | 23,460 |
| Benefit (provision) for income taxes[1] | (4,264) | (248) | 2,002 | (733) | (609) | (675) | (724) |
| *Net (loss) income* | $(44,717) | $10,133 | $ (46,887) | $ 31,360 | $ 29,709 | $ 23,223 | $ 22,736 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| *(Loss) earnings per share* | $ (1.00) | $ 0.32 | $ (1.31) | $ 0.97 | $ 0.92 | $ 0.72 | $ 0.70 |
| Weighted average share outstanding | 44,855 | 32,000 | 35,838 | 32,261 | 32,330 | 32,330 | 32,330 |

57. Concerning the Company's "Gross Profit," both Registration Statements explained that "[g]ross profit is net sales less cost of sales" and that "[g]ross margin is the percentage determined by dividing gross profit by net sales," with the December 2012 Registration Statement stating that "[i]n 2011, 2010, and 2009 our gross margin was 73.6%, 73.3%, and 72.7%, respectively," and that the "[f]or the nine months ended September 30, 2012 and 2011, our gross margin was 72.9% and 73.7%, respectively," and the June 2013 Registration Statement stating that "[f]or the three months ended March 31, 2013 and 2012 our gross margin was 71.0% and 73.5%, respectively," and that "[i]n 2012, 2011, and 2010 our gross margin was 72.8%, 73.6%, and 73.3%, respectively." The December 2012 Registration Statement also stated that "*[w]e have been able to maintain stable gross margins as a result of product cost control and expect that our gross margin will continue in the same range*," whereas the June 2013 Registration Statement also stated that "*[w]e have been able to maintain relatively stable gross margins as a result of product cost control and retail price adjustments, in the past*. However, increases in product costs, freight, and distribution costs, along with increased promotional activity may adversely impact our gross margins by 100 to 200 basis points over the next several years."

58. The statements referenced above with respect to the Registration Statements were each materially false and misleading because they failed to disclose and misrepresented the following adverse facts that existed at the time of the Offerings:

(a) Tile Shop had been acquiring the vast majority of its product from China, paying below-market prices for product that contained dangerously high lead levels;

(b)    as a result of its sourcing product from China with dangerously high lead levels, the Company was reporting unsustainably high profit margins and faced customer backlash and millions of dollars in potential legal liability;

(c)    Tile Shop had acquired 8.3% of its product sold in fiscal 2011, 16.3% of its product sold in fiscal 2012, and 32.2% of its product sold in fiscal 2013 from Chinese supplier BP that was owned and operated by defendant Rucker's brother-in-law, Fumitake Nishi, who was also himself an employee of Tile Shop, and as such, compliance with Item 404 of SEC Regulation S-K required that the purchases from BP be identified as related party transactions in the Registration Statements – but they were not;

(d)    Tile Shop had been using BP and other captive, phantom suppliers to overstate inventories, understate cost of sales, and overstate gross profits in its financial reports summarized and incorporated by reference into the Registration Statements; and

(e)    that as a result of the foregoing, the Registration Statements overstated the Company's past financial report by failing to disclose that the Company had been paying below-market prices to its suppliers, the reasons why, or that its ability to pay below-market prices for supplies was unsustainable.

59.    The adverse events and uncertainties associated with the Company's sourcing tile products with dangerously high lead levels, and from phantom, controlled suppliers at below-market prices, identified above, would have a negative impact on the Company's continuing operations. Accordingly, the Registration Statements were required to disclose these facts but did not.  These known trends, events, or uncertainties that were reasonably likely to have a material adverse effect on Tile Shop's sales revenues and profits, and consequently, on the Company's future operating results and present stock value, were negligently omitted from the Registration Statements.

60.     The December 2012 and June 2013 SPO's were successful for Tile Shop, the Selling Stockholders and the underwriters.  In the December 2012 SPO, the 5.175  million shares of Tile Shop common stock were sold to the public at $15.00 per share, with the Selling Stockholders obtaining $77.625 million in gross proceeds, and in the June 2013 SPO, 4,887,500 shares of Tile Shop common stock were sold to the public at $24.25 per share, with the Selling Stockholders obtaining more than $103 million in gross proceeds.

61.     On October 21, 2013, financial media website *seekingalpha.com* published a research report authored by a research and investment firm called Infitialis Research Collective ("Infitialis"), entitled "The Tile Shop: Poisoned Tile, Bad Actors, Unsustainable Margins, And A Stock Ready To Crack."  The Infitialis report emphasized, in pertinent part, as follows:

- that its "independent laboratory testing results indicate[d] a significant number of The Tile Shop products ha[d] DANGEROUS lead contaminations, up to 13,900% greater than the United States' Consumer Product Safety Commission limits for products that come in contact with children";

- that "Tile Shop's lead contaminated products represent a clear and present danger to consumer safety as the tiles are recommended for kitchen and bath installation in close proximity to food prep and shower areas, significantly increasing the probability of lead transmission to children";

- that "[i]n addition to consumers abandoning The Tile Shop due to significant concerns about product safety, the liabilities associated with any potential product recalls, regulatory investigations, and class action litigation could swamp the company's very limited liquidity and less than $3.8mm in available cash"; and

- *significantly, that "[t]he Tile Shop's LTM EBITDA margins of 27.0% is more than 2x its peer comparables and will compress due to its reliance on mickey-mouse Chinese suppliers and increasing overhead costs."*

62.     On this news, the price of Tile Shop's common stock declined more than $2 per share – more than 8% – from its close of $25.87 per share on October 18, 2013 to close at $23.79 per share on October 21, 2013, on unusually high trading volume of more than 2.86 million shares trading, or more than 8.6 times the average daily volume over the preceding 10 trading days.

63.     Then, on October 30, 2013, after the close of trading, Tile Shop issued a press release announcing its 2013 third quarter results (for the period ended September 30, 2013). Rather than the $0.10 per share earnings defendants had led the market to expect, Tile Shop reported just $0.08 per share in earnings. And, during the conference call held with investors that evening, defendants stated that the Company was increasing its fiscal 2013 revenue guidance from $222 million to between $227 million and $237 million, without simultaneously increasing the Adjusted EBITDA guidance, *demonstrating that the Company's profit margins were falling*. Defendant Clayton also disclosed that, contrary to defendants' strong Class Period mantra that the rapid store expansion was increasing profits, in reality, "[a]s the number of newer stores increases in relation to the total number of stores, the EBITDA drag effect [would] increase, as well," with "[t]he most significant effect of this . . . in the third and fourth quarters of [2013]," and that it would "continue to impact 2014 results, [though] to a lesser extent." During the call, defendant Clayton also conceded, when pressed by an analyst, that Tile Shop had been forced to engage in discounting to "push some . . . slower mov[ing]" product, which had negatively impacted margins. Defendant Rucker also conceded during the conference call that "the issue of [Tile Shop's] product quality and . . . product safety, [had] been questioned recently," disclosing in pertinent part as follows:

> *With the use of natural substances . . . comes the possibility that they may contain trace amounts of inorganic metals. Also, glazing compounds used in ceramics may contain small quantities of these elements. . . . [O]ver the past 10 days, we have worked with our vendors around the world to revalidate that no unnatural substances are used in the manufacture, or fabrication of the products that we purchase. We have also tested a number of these products ourselves. In addition, we have engaged URS, who is the worldwide provider of engineering, construction and technical services and the leading provider of environmental services, to validate our understanding and conclusions with respect to the overall safety of our products.*

Defendant Rucker concluded those opening comments stating that the Company was "continu[ing] to expand [its] quality control procedures, and [would] provide more information on this matter on [its] website."

64.     On this news, the price of the Company's common stock fell upwards of 19% in intraday trading when trading resumed on October 31, 2013, closing down $1.17 per share, or approximately 5%, on usually high trading volume of more than 4 million shares trading, or more than 6 times the average daily trading volume over the preceding 7 trading days.

65.     Finally, on November 14, 2013, research and investment firm Gotham City Research ("Gotham") published a report disclosing that, unbeknownst to investors, Tile Shop had acquired 8.3% of its product sold in fiscal 2011, 16.3% of its product sold in fiscal 2012, and 32.2% of its product sold in fiscal 2013 from Chinese supplier BP that was owned and operated by defendant Rucker's brother-in-law, Fumitake Nishi, who was also himself an employee of Tile Shop. Citing import/export records and other documents obtained from China, Gotham demonstrated that Tile Shop was purchasing its product from BP at cost, permitting Tile Shop to report its outsized margins and profits. Though Item 404 of SEC Regulation S-K required that the purchases from BP be identified as related party transactions, they had not been. Gotham also claimed, in a detailed 58-page report, that Tile Shop had been using BP and other captive, phantom suppliers to overstate inventories, understate cost of sales and overstate gross profits in its financial reports without disclosing this to investors. Gotham claimed that Tile Shop inflated its earnings by 200% during fiscal 2013 alone by using its China-based controlled "phantom" suppliers to beef up its numbers.

66.     On this news, shares of Tile Shop plummeted another almost 39%, or $8.27 per share, to close at $12.95 per share on November 14, 2013, on extremely usually high trading volume of more than 19.5 million shares trading, and tripping the NASDAQ's short sale circuit breaker. In the

end, on these disclosures, the price of Tile Shop stock declined nearly $18 per share from its Class

Period high, and *more than $900 million in market capitalization simply vanished*.

## CLASS ACTION ALLEGATIONS

67.     Plaintiff brings this action as a class action on behalf of all persons who purchased or

otherwise acquired Tile Shop common stock during the Class Period (the "Class").

68.     Excluded from the Class are defendants and their families, the officers and directors

and affiliates of the defendants, at all relevant times, members of their immediate families and their

legal representatives, heirs, successors or assigns, and any entity in which defendants have or had a

controlling interest.

69.     The members of the Class are so numerous that joinder of all members is

impracticable.  While the exact number of Class members is unknown to plaintiff at this time and

can only be ascertained through appropriate discovery, plaintiff believes that there are hundreds of

members in the proposed Class.  Record owners and other members of the Class may be identified

from records maintained by Tile Shop or its transfer agent and may be notified of the pendency of

this action by mail, using the form of notice similar to that customarily used in securities class

actions.

70.     Plaintiff's claims are typical of the claims of the members of the Class as all members

of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is

complained of herein.

71.     Plaintiff will fairly and adequately protect the interests of the members of the Class

and has retained counsel competent and experienced in class and securities litigation.

72.     Common questions of law and fact exist as to all members of the Class and

predominate over any questions solely affecting individual members of the Class.  Among the

questions of law and fact common to the Class are:

      (a)    whether defendants violated the 1934 Act;

      (b)    whether statements made by defendants to the investing public omitted and/or misrepresented material facts about the business and operations of Tile Shop;

      (c)    whether defendants knew or deliberately disregarded that their statements were false and misleading; and

      (d)    to what extent the members of the Class have sustained damages and the proper measure of damages.

73.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## LOSS CAUSATION/ECONOMIC LOSS

74.    During the Class Period, Tile Shop and the Individual Defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Tile Shop common stock and operated as a fraud or deceit on Class Period purchasers of Tile Shop common stock by misrepresenting the Company's business and prospects. Later, when their prior misrepresentations and fraudulent conduct became apparent to the market, the price of Tile Shop common stock fell precipitously, as the prior artificial inflation came out of the price over time. As a result of their purchases of Tile Shop common stock during the Class Period, plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

**NO SAFE HARBOR**

75.     Tile Shop's verbal "Safe Harbor" warnings accompanying its oral forward-looking statements ("FLS") issued during the Class Period were ineffective to shield those statements from liability.

76.     The defendants are also liable for any false or misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer of Tile Shop who knew that the FLS was false. None of the historic or present tense statements made by defendants were assumptions underlying or relating to any plan, projection or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

**COUNT I**

**For Violation of §10(b) of the 1934 Act and Rule 10b-5**
**Against Tile Shop and the Individual Defendants**

77.     Plaintiff incorporates ¶¶1-76 by reference.

78.     During the Class Period, defendants Tile Shop and the Individual Defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, as detailed above.

79.     The defendants named in this Count violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

        (a)     employed devices, schemes and artifices to defraud;

- 29 -

(b)      made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)      engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Tile Shop common stock during the Class Period.

80.      Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Tile Shop common stock.  Plaintiff and the Class would not have purchased Tile Shop common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by these defendants' misleading statements.

## COUNT II

### For Violation of §20(a) of the 1934 Act
### Against Tile Shop, the Individual Defendants, TS, Inc. and JWTS

81.      Plaintiff incorporates ¶¶1-80 by reference.

82.      The Individual Defendants, TS, Inc. and JWTS acted as controlling persons of Tile Shop within the meaning of §20(a) of the 1934 Act.  By reason of the Individual Defendants' positions with the Company, and the Individual Defendants', TS, Inc.'s and JWTS's ownership of Tile Shop common stock, the Individual Defendants, TS, Inc. and JWTS had the power and authority to cause Tile Shop to engage in the wrongful conduct complained of herein.  Tile Shop controlled the Individual Defendants and all of its employees.  By reason of such conduct, these defendants are liable pursuant to §20(a) of the 1934 Act.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment as follows:

- 30 -

A.    Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

B.    Awarding plaintiff and the members of the Class damages, including interest;

C.    Awarding plaintiff's reasonable costs and attorneys' fees;

D.    Awarding rescission or a rescissory measure of damages; and

E.    Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED:  November 21, 2013

ROBBINS GELLER RUDMAN
   & DOWD LLP
SAMUEL H. RUDMAN

SAMUEL H. RUDMAN

58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)

JOHNSON & WEAVER, LLP
FRANK J. JOHNSON
BRETT M. WEAVER
110 West A Street, Suite 750
San Diego, CA  92101
Telephone:  619/230-0063
619/255-1856 (fax)

Attorneys for Plaintiff

**CERTIFICATION OF PLAINTIFF PURSUANT
TO THE FEDERAL SECURITIES LAWS**

I, Craig Puerta, declare the following as to the claims asserted, or to be asserted, under the federal securities laws:

1.    I have reviewed the complaint with my counsel and authorize its filing.

2.    I did not acquire the securities that are the subject of this action at the direction of plaintiff's counsel or in order to participate in any private action or any other litigation under the federal securities laws.

3.    I am willing to serve as a representative party on behalf of the class, including testifying at deposition or trial, if necessary.

4.    I made the following transactions during the Class Period in the securities that are the subject of this action.

**Acquisitions:**

| Date Acquired | Number of Shares Acquired | Acquisition Price Per Share |
|---|---|---|
| 2/28/13 | 100 | 17.69 |
| 10/22/13 | 50 | 23.57 |
| 10/31/2013 | 50 | 19.83 |

**Sales:**

| Date Sold | Number of Shares Sold | Selling Price Per Share |
|---|---|---|
| 3/25/13 | 100 | 22.01 |
| | | |

5.    I will not accept any payment for serving as a representative party beyond my pro-rata share of any recovery, except reasonable costs and expenses -- such as lost wages and travel expenses -- directly related to the class representation, as ordered or approved by the Court pursuant to law.

6.    I have not sought to serve or served as a representative party for a class in an action under the federal securities laws within the past three years, except if detailed below:

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this ⬚ day of November, 2013.